## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Civil No. 3:18-cv-02031 |
| TRADEBE TREATMENT AND RECYCLING NORTHEAST, LLC, | ) |
| Defendant. | ) |

### UNOPPOSED MOTION TO ENTER CONSENT DECREE

Plaintiff, United States of America, moves for entry of the Consent Decree lodged with the Court on December 12, 2018 [ECF No. 2-1], for the reasons set forth in Plaintiff's accompanying memorandum of law. Following publication in the Federal Register under 28 C.F.R. § 50.7, the proposed Consent Decree underwent the required period for public comment. The United States received no comments. Under Paragraph 73 of the Consent Decree, the Defendant, Tradebe Treatment and Recycling Northeast, LLC, consents to its entry.

Because the proposed Consent Decree is fair, reasonable and in the public interest, the Plaintiff requests that the Court grant this motion and enter the Consent Decree by signing it on page 25.

Respectfully submitted,

For Plaintiff, UNITED STATES OF AMERICA

ROBERT E. MAHER, JR.
Assistant Chief
Environmental Enforcement Section
U.S. Department of Justice
Environment and Natural Resources Division

/s/ *Brian Donohue*
BRIAN G. DONOHUE, Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 514-0414
brian.donohue@usdoj.gov

JOHN H. DURHAM
United States Attorney
District of Connecticut

NDIDI MOSES
Assistant United States Attorney
U.S. Attorney's Office
450 Main Street
Hartford, Connecticut 06103

OF COUNSEL:

STEVEN J. VIGGIANI
Senior Enforcement Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Square - Suite 100
Boston, MA 02109-3912

2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TRADEBE TREATMENT AND<br>RECYCLING NORTHEAST, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil No. 3:18-cv-02031<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF
## UNOPPOSED MOTION TO ENTER CONSENT DECREE

Plaintiff, United States of America, files this memorandum in support of its motion to enter the Consent Decree [ECF 2-1] lodged with the Court on December 12, 2018. If entered, the Consent Decree would resolve Plaintiff's claims set forth in the Complaint filed the same day against the Defendant, Tradebe Treatment and Recycling Northeast, LLC ("Tradebe"). The Complaint [ECF-1] alleges that Tradebe is liable for violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, and their underlying regulations and permits, at its Meriden and Bridgeport, Connecticut, hazardous waste treatment, storage and disposal facilities ("TSDFs"). In the Complaint, the United States seeks injunctive relief and civil penalties to address those violations.

If the Consent Decree is entered, Tradebe will resolve its liability by agreeing to maintain full compliance with the CAA and RCRA at the Meriden and Bridgeport TSDF facilities, and

1

will adopt additional environmental protection measures. Tradebe agrees to install new thermal oxidizers at each facility to replace currently-used carbon adsorption equipment to control harmful air emissions, will install other protective equipment, and will perform enhanced leak monitoring for a period of two years. In addition, Tradebe agrees to pay a civil penalty of $525,000.

Consistent with 28 C.F.R. § 50.7, the proposed Consent Decree provides a 30-day public comment period, which began when notice of the settlement was published in the Federal Register on December 18, 2018. 83 Fed. Reg. 64878. The comment period is now closed, and the United States received no comments. Tradebe consents to entry of the Consent Decree. *See* Consent Decree, ¶ 73. Because the Consent Decree is fair, reasonable, and in the public interest, the United States requests that the Court enter the Consent Decree as a final judgment by signing it at page 25.

## I. BACKGROUND

### A. Statutory/Regulatory Background

1. Clean Air Act

The CAA, 42 U.S.C. §§ 7401 – 7671q, establishes a comprehensive scheme for protecting and enhancing the quality of the nation's air. Section 112 of the CAA, 42 U.S.C. § 7412, lists various hazardous air pollutants ("HAPs") and requires EPA to establish national emission standards for major sources of HAPs. Pertinent to this case, EPA promulgated the National Emissions Standards for Hazardous Air Pollutants From Off-Site Waste and Recovery Operations at 40 C.F.R. Part 63, Subpart DD, §§ 63.680 - 63.698 ("CAA Subpart DD"). CAA Subpart DD incorporates various general provisions and requirements for major sources of HAPs contained in 40 C.F.R. Part 63, Subpart A, §§ 63.1 - 63.16.

Title V of the CAA, 42 U.S.C. §§ 7661 - 7661f, establishes an operating permit program for states for various air pollution sources, including all sources subject to standards or regulations under Section 112 of the CAA. Under Section 113(b) of the CAA, 42 U.S.C. § 7613(b), the United States may enforce requirements of Section 112 and Title V of the CAA, including associated regulatory and permit requirements.

2. Resource Conservation and Recovery Act

In 1976, Congress enacted RCRA in order to regulate hazardous waste management. *See* Sections 3001 - 3023 of RCRA, 42 U.S.C. §§ 6921 - 6939e. EPA promulgated regulations under RCRA that set forth standards and requirements applicable to generators of hazardous waste and to owners and operators of facilities that treat, store, or dispose of hazardous waste. Those regulations are codified at 40 C.F.R. Parts 260 - 271. Since its passage, Congress has enacted various amendments to RCRA, including the Hazardous and Solid Waste Amendments of 1984 ("HSWA"). HSWA codified various new provisions in Section 3004 of RCRA, including Section 3004(n), 42 U.S.C. § 6921(n), which required EPA to promulgate air emission control regulations for TSDFs. EPA promulgated those regulations at 40 C.F.R. Part 264, Subparts AA, BB and CC ("RCRA Subparts AA, BB and CC"). There is significant overlap between CAA Subpart DD and the air emission regulations in RCRA Subpart AA, BB and CC.

Under Section 3006 of RCRA, 42 U.S.C. § 6926, EPA may authorize a state to administer the RCRA hazardous waste program. In 1990, EPA granted Connecticut authority to manage its base hazardous waste program, and in 2004, granted Connecticut authorization to administer additional RCRA requirements and regulations, including the HSWA requirements set out in RCRA Subparts AA, BB and CC. *See* 55 Fed. Reg. 51707 (December 17, 1990) and 69 Fed. Reg. 57842 (September 28, 2004).

3

The Connecticut Department of Energy and Environmental Protection ("CT DEEP") administers the Connecticut hazardous waste program through hazardous waste management regulations set out at RCSA Title 22a, §§ 22a-449(c)-1 through 22a-449(c)-119. Connecticut's hazardous waste regulations contain EPA-authorized hazardous waste regulations, including HSWA-related regulations and hazardous waste facility permitting requirements. Many of Connecticut's hazardous waste regulations incorporate federal hazardous waste regulations by reference, including RCRA Subparts AA, BB and CC. Section 3006 of RCRA, 42 U.S.C. § 6926, provides that authorized state hazardous waste programs are carried out under RCRA, and thus, a violation of a requirement of an authorized state hazardous waste program is a violation of RCRA. Under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), the United States may enforce violations of any requirement of RCRA and its implementing regulations, and state TSDF permits issued under it.

### B.  The Facilities

Tradebe is a privately-held Delaware corporation headquartered in Indiana. Complaint, ¶ 6. It owns and operates the Meriden and Bridgeport TSDFs, both of which it purchased through an affiliate in 2011. *Id.*, ¶¶ 7, 26-27. Operations at the facilities are similar. Various non-hazardous and hazardous liquid wastes are brought to the facilities and stored/managed in various tanks and other areas within the TSDFs. *Id.*, ¶¶ 44-45, 74-75. At one time, both facilities were allegedly major sources of HAPs, and subject to CAA Subpart DD. *Id.*, ¶ 44. In August 2018, however, the facilities obtained permits to operate as minor sources of HAPs through issuance of General Permits to Limit Potential to Emit ("GPLPEs") by CT DEEP. *Id.*, ¶ 46. Upon issuance and compliance with the GPLPEs, the facilities were no longer subject to CAA Subpart DD. *Id.*, § 44-47. Each facility currently has an air pollution control system that

4

uses regenerative carbon adsorption technology to reduce HAPs and volatile organic compound emissions. *Id.*, App. 1, ¶ 5-6.

EPA and CT DEEP performed separate RCRA compliance inspections in 2015 at the Meriden and Bridgeport facilities, and EPA performed CAA compliance inspections at both facilities that same year. *Id.*, ¶¶ 31-35. Those inspections disclosed numerous violations of both statutes, leading to EPA's issuance of notices of violations and potential violations at both locations. *Id.*

C. **Alleged Violations**

1. CAA Subpart DD

CAA Subpart DD's requirements apply to specific regulated units -- in this case, tanks. *Id.*, Section VIII.A.1. CAA Subpart DD-subject tanks must be controlled for HAP emissions by one of several control device options, including a closed vent system to a carbon adsorber or incinerator. *Id.* Both the Meriden and Bridgeport facilities use carbon adsorption, *supra*, but emissions from some alleged CAA Subpart DD-subject tanks were not properly controlled. *Id.*, First Claim for Relief. In addition, CAA Subpart DD requires a subject facility to provide a notice of compliance status. Tradebe never did so. *Id.*, Second Claim for Relief. The Complaint alleges that Tradebe was also required to apply for Title V permits for both facilities, and operate the facilities in compliance with them. Tradebe did not apply for Title V permits, *id.*, Third Claim for Relief, and was not operating in compliance with its required permits. *Id.*, Fourth Claim for Relief.

2. RCRA

The remaining violations in the Complaint relate to RCRA Subparts AA, BB and CC and the facilities' state TSDF permits. Most of the Meriden facility's violations are based on EPA

5

inspections and follow-up information request responses. *Id., passim.* Most of the Bridgeport facility's violations were discovered by CT DEEP. *Id.* The violations range from recordkeeping deficiencies to housekeeping and general maintenance activities, some of which posed potential risks to the environment and the surrounding community. The alleged violations at the Meriden facility include:

- Failure to provide adequate site security – a gate at the facility was left open overnight, allowing access to an open trailer that may have contained hazardous waste (Fifth Claim for Relief);
- Storage of hazardous waste in a tractor trailer in an unauthorized location (Sixth Claim for Relief);
- Failure to report a hazardous waste release from a drum punctured by a forklift, as required by Meriden's TSDF permit (Seventh Claim for Relief);
- Failure to conduct adequate inspections for deteriorating conditions such that cracks and graveled areas were present in outdoor paved surfaces at the facility, potentially allowing hazardous waste to enter soil or groundwater if there were a release (Eighth Claim for Relief);
- Failure to maintain tank overflow protection equipment to prevent tank overfills and spills (Ninth Claim for Relief);
- Failure to obtain and provide a tank integrity assessment for a hazardous waste tank (Tenth Claim for Relief);
- Failure to comply with RCRA Subpart CC air emission control standards for tanks (Eleventh Claim for Relief);
- Failure to perform RCRA Subtitle BB leak monitoring on tanks (Twelfth Claim for Relief);
- Failure to minimize threats from hazardous waste releases resulting from hazardous waste drum spills and cracked outdoor pavement (Thirteenth Claim for Relief);
- Failure to maintain an up-to-date contingency plan (Fourteenth Claim for Relief);
- Failure to conduct hazardous waste personnel training for a number of employees (Fifteenth Claim for Relief); and,
- Failure to have quality assurance/quality control protocols for Meriden's laboratory operations (Sixteenth Claim for Relief).

The alleged violations at the Bridgeport facility include:

- Storage of 30 totes of hazardous waste in an unauthorized location (Seventeenth Claim for Relief);
- Failure to report a hazardous waste release from a tank into a containment vault (Eighteenth Claim for Relief);
- Failure to document inspections (Nineteenth Claim for Relief);

6

- Failure to obtain an provide complete tank integrity assessments for four hazardous waste tanks (Twentieth Claim for Relief);
- Failure to document claimed RCRA Subpart BB exemptions for a number of tanks (Twenty-First Claim for Relief);
- Failure to maintain required RCRA Subtitle BB inspection records (Twenty-Second Claim for Relief); and,
- Failure to maintain an up-to-date contingency plan (Twenty-Third Claim for Relief).

### D. Consent Decree

The Consent Decree includes injunctive requirements and civil penalties. As part of the injunctive relief, Tradebe's facilities must comply with its state TSDF permits and underlying RCRA regulations, including RCRA air emission requirements, and must specifically maintain compliance with the TSDF permit provisions that were allegedly violated at each facility. Consent Decree, ¶ 13, App. 1. The Consent Decree also requires the installation and testing of new thermal oxidizers for air emission control at both facilities to replace the facilities' current carbon adsorption systems. *Id.* There is no specific CAA NESHAP injunctive relief because the facilities are no longer subject to Subpart DD due to the issuance of the GPLPEs; instead, the Decree requires the facilities to comply with the GPLPEs. *Id.*

The Decree also includes enhanced leak detection and repair requirements related to air emissions, *id.*, Section G, that are intended to mitigate excess prior air emissions from tank/equipment leaks at the facilities. Tradebe will adopt and follow those air emission reduction measures for a two-year period. Tradebe will also install new tank overfill protection equipment at both facilities. *Id.*

Finally, the Decree includes a $525,000 penalty. *Id.*, Section IV.

### III. THE STANDARD FOR APPROVING CONSENT DECREES

A consent decree should be approved if it is fair, reasonable, and in the public interest. *See SEC v. Citigroup Global Mkts.*, 752 F.3d 285, 294 (2d Cir. 2014); *accord In Re Tronox Inc.*, No.

7

14-cv-5495, 2014 U.S. Dist. LEXIS 158767, at *25 (S.D.N.Y. Nov. 10, 2014); *United States v. IBM Corp.*, No. 14-cv-936, 2014 U.S. Dist. LEXIS 91750, at *2 (S.D.N.Y. July 7, 2014), order clarified, 2014 U.S. Dist. LEXIS 133881 (S.D.N.Y. Aug. 7, 2014). In examining a proposed consent decree, the district court "should be guided by the general principle that settlements are to be encouraged." *Am. Canoe Ass'n Inc. v. EPA*, 54 F. Supp. 2d 621, 625 (E.D. Va. 1999) (quoting *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); *see also Citigroup*, 752 F.3d at 293 ("[The second Circuit] recognizes a 'strong federal policy favoring the approval and enforcement of consent decrees.'" (quoting *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)). This principle recognizes that settlements allow parties and courts to preserve scarce resources. *Autera v. Robinson*, 419 F.2d 1197, 1199 (D.C. Cir. 1969); *see also ARO Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) (settlements conserve the resources of the courts, the litigants, and the taxpayers and "should . . . be upheld whenever equitable and policy considerations so permit.").

Indeed, a consent decree is a "highly useful tool for government agencies," because it "maximizes the effectiveness of limited law enforcement resources" by permitting the government to obtain compliance with the law without lengthy litigation. *United States v. City of Jackson, Mississippi*, 519 F.2d 1147, 1151 (5th Cir. 1975); *see also In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019, 1029 (D. Mass. 1989) ("Congressional purpose is better served through settlements . . ., rather than the expenditure of limited resources on protracted litigation."). And because of the deference owed to government agencies with substantive expertise, the policy favoring settlement is particularly strong in environmental cases.[1]

---

[1] *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992); *see also United States v. SEPTA*, 235 F.3d 817, 822 (3d Cir. 2000); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d

8

Whether to approve a consent decree is within the discretion of the Court, *see United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985), but a court should "tak[e] care not to infringe on the [federal government's] discretionary authority to settle on a particular set of terms." *Citigroup*, 752 F.3d at 295. As the Second Circuit explained:

> Consent decrees are primarily about pragmatism. Consent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation. Thus, a consent decree must be construed as . . . written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation. Consent decrees provide parties with a means to manage risk. The numerous factors that affect the litigant's decision whether to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt. These assessments are uniquely for the litigants to make.

*Citigroup*, 752 F.3d at 295 (internal citations and quotations omitted).

Accordingly, in reviewing a consent decree, a court "should not substitute [its] own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 315 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Nor should it inquire "whether the settlement is one which the court itself might have fashioned, or considers as ideal," *United States v. Cannons Eng'g. Corp.*, 899 F.2d 79, 84 (1st Cir. 1990), or seek to determine whether the proposed settlement provides for "every benefit that might someday be obtained in contested litigation." *United States v. Allegheny-Ludlum Indus., Inc.* 517 F.2d 826, 850 (5th Cir. 1975). Moreover, a court is not authorized to rewrite or modify the parties' agreement; it must consider and approve or reject as a whole the proposal as submitted by the parties. *Brooks v. Ga. State*

---

1409, 1436 (6th Cir. 1991); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990); *SEC v. Randolph,* 736 F.2d 525, 529 (9th Cir. 1984); *United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985).

9

*Bd. of Elections*, 59 F.3d 1114, 1119-20 (11th Cir. 1995); *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348 (6th Cir. 1986); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982).

"Absent a substantial basis in the record for concluding that the proposed consent decree does not meet [the requirements of fairness, reasonableness, and serving the public interest], the district court is required to enter the order." *Citigroup*, 752 F.3d at 294. As explained by the Second Circuit, four primary factors should be considered in evaluating whether a settlement by a governmental enforcement agency is fair and reasonable: "(1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." *Citigroup*, 752 F.3d at 294-95 (internal citations omitted); *accord In Re Tronox Inc.*, 2014 U.S. Dist. LEXIS 158767, at *26; *United States v. IBM Corp.*, 2014 U.S. Dist. LEXIS 91750, at *4-5.

### III. ARGUMENT

This Court should approve the proposed Consent Decree because it is fair, reasonable, and serves the public interest.

#### A. The Proposed Consent Decree is Fair and Reasonable

The four *Citigroup* factors for determining a fair and reasonable settlement all support approval of the proposed Consent Decree. First, the Decree meets the "basic legality" requirement. 752 F.3d at 294. A settlement agreement "satisfies this factor so long as it is within the Court's authority to enter the decree and within [the Plaintiff's] authority to enforce it." *IBM Corp.*, 2014 U.S. Dist. LEXIS 91750, at *5; *accord Tronox*, 2014 U.S. Dist. LEXIS 158767, at *27. Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Sections 3008(a) and (g) of RCRA, 42 U.S.C. §§ 6928(a) and

10

(g), confers on this Court jurisdiction to require the relief set forth in the proposed Consent Decree here: compliance with the CAA and RCRA, payment of civil penalties, and other appropriate relief.

The second *Citigroup* factor -- "whether the terms of the decree, including its enforcement mechanism, are clear," 752 F.3d at 295 -- is likewise satisfied. From an enforcement perspective, the key terms of the proposed Consent Decree are straightforward. *See Tronox*, 2014 U.S. Dist. LEXIS 158767, at *27 ("the terms of the decree, and its enforcement mechanism, are clearly stated in the Settlement Agreement"); *IBM Corp.*, 2014 U.S. Dist. LEXIS 91750, at *7 ("By 'clear,' the Second Circuit appears to mean that the decree 'properly defines' its key provisions.") (internal citations omitted)). Here, the proposed Consent Decree defines key terms, *see* Consent Decree, Section III, and sets forth detailed and unambiguous obligations and schedules for Defendants, including the payment of a civil penalty, reporting requirements, and stipulated penalties. *See* Consent Decree, Secs. IV-VII, and App 1. And the United States did not receive any comments suggesting that the Consent Decree's terms or obligations were unclear.

The Consent Decree also meets the third Citigroup factor -- "whether the consent decree reflects a resolution of the actual claims in the complaint." *Citigroup*, 752 F.3d at 295. Here, the Complaint asserts claims for relief against Defendants for violations of specific provisions of the CAA and RCRA and their underlying regulations. *Id.*, Section VIII. The Consent Decree expressly requires Tradebe to comply with the law upon its entry, and provide quarterly progress compliance reports to EPA. *Id.*, Section V-VII and App. 1, Section I. In addition, Tradebe is required to install two thermal oxidizers, conduct performance testing of that equipment, install tank overfill prevention controls at the Meriden facility, and perform leak detection and monitoring of emissions at both facilities for a period of two years. *Id.*, App. 1, Sections B, C, G, and H. The proposed Consent Decree also requires Tradebe to pay a penalty of $525,000. *Id.*, Section IV.

11

In exchange, the Consent Decree provides that it "resolves the civil claims of the United States for the violations alleged in the Complaint." Id., ¶ 56. *See Tronox*, 2014 U.S. Dist. LEXIS 158767, at *28 (finding that the settlement expressly resolved all claims asserted in the complaint); *IBM Corp.*, 2014 U.S. Dist. LEXIS 91750, at *8 (finding that where settlement provided relief sought by the complaint, the settlement agreement satisfied third factor of *Citigroup*).

The fourth factor -- "whether the consent decree is tainted by improper collusion or corruption of some kind," *Citigroup*, 752 F.3d at 295 -- is met, as well. This settlement is the result of arm's-length negotiation between sophisticated parties represented by experienced counsel. The United States was represented by the Department of Justice, as well as experienced attorneys and technical personnel from EPA. Likewise, Tradebe had experienced counsel and technical representatives. Extensive technical discussions focused on the compliance efforts and mitigation actions that are required by the Decree. Nothing in the record indicates that improper collusion or corruption of any kind tainted the negotiations process in this case, *see Sam Fox Publ'g Co., Inc. v. United States*, 366 U.S. 683, 689 (1961) ("sound policy would strongly lead [the court] to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting [a] . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting"), and no one has made that contention.

### B. The Consent Decree Furthers the Public Interest

When a court decides whether to approve a proposed consent decree that contains injunctive relief, the court must "consider whether the public interest would be disserved by entry of the consent decree." *Citigroup*, 752 F.3d at 297. When evaluating the public interest, courts have examined whether the consent decree comports with the purpose of the statute being enforced, whether the consent decree bars private litigants from pursuing independent claims, and the balance of considerations such as litigation risks and minimizing the expense of litigation. *See, e.g., id.* ("a

12

consent decree may disserve the public interest if it barred private litigants from pursuing their own claims independent of the relief obtained under the consent decree . . ."); *Tronox*, 2014 U.S. Dist. LEXIS 158767, at *28 (finding that the consent decree "does not disserve the public interest, because it facilitates the enforcement of federal environmental laws, resolves a proceeding that requires significant judicial resources to administer, and facilitates the more speedy and full compensation of [Defendant's] many creditors"); *IBM Corp.*, 2014 U.S. Dist. LEXIS 91750, at *11-13; *Sierra Club v. Coca-Cola Corp.*, 673 F. Supp. 1555, 1556 (M.D. Fla. 1987) ("Where the lawsuit seeks to enforce a statute, the most important factor as to public policy is whether the decree comports with the goals of Congress."). However, a court cannot "find the public interest disserved based on its disagreement with the [Plaintiff's] decisions on discretionary matters of policy . . . ." *Citigroup*, 752 F.3d at 297. Indeed, "[t]he job of determining whether the proposed . . . consent decree best serves the public interest . . . rests squarely with the [federal government], and its decision merits significant deference." *Id.*

Here, the proposed Consent Decree serves the public interest. First, it comports with the goals of the CAA and RCRA. The Consent Decree furthers primary statutory goals of protecting the public by requiring full compliance with the CAA's and RCRA's regulatory and permitting scheme, and imposing a penalty to deter future violations by Defendant. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000) ("Congress has found that civil penalties . . . do more than promote immediate compliance by limiting the defendant's economic incentive to delay [compliance]; they also deter future violations."). Further, the proposed Consent Decree requires the installation of new thermal oxidizers at each facility to replace the current carbon adsorption systems, and requires that the oxidizers undergo performance testing to demonstrate compliance with RCRA air emission

13

regulation requirements. Consent Decree, App. 1, Section D. And it also requires enhanced leak detection and repair for a two year period, along with the installation of overfill protection equipment.

Also, the proposed Consent Decree does not disserve the public interest by precluding third party rights of action. *Citigroup*, 752 F.3d at 297. Indeed, the Consent Decree specifically provides that it does not restrict such actions. *Id.*, ¶ 60. Finally, the Consent Decree appropriately balances competing settlement considerations, including the need and benefit of prompt compliance by Defendants and minimizing the expense of litigation, while at the same time taking into consideration the litigation risks confronting all parties. By efficiently resolving the claims and defenses, the settlement will conserve resources of the parties that would otherwise be spent on litigating the claims in this case. *See, e.g., Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) ("Not only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation.")

## IV.   CONCLUSION

The Consent Decree is fair, reasonable, furthers the public interest, and reflects an appropriate weighing of the litigation risks by all parties. The United States received no comments during the public comment period. Therefore, the United States respectfully requests that the Count grant the Plaintiff's motion to enter the Consent Decree as an Order of the Court. (A signature line for the Court is included in the Consent Decree at page 25.)

Respectfully submitted,

For Plaintiff, UNITED STATES OF AMERICA

ROBERT E. MAHER, JR.
Assistant Chief
Environment and Natural Resources Division
United States Department of Justice

/s/ *Brian Donohue*
BRIAN G. DONOHUE, Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 514-0414
brian.donohue@usdoj.gov

JOHN H. DURHAM
United States Attorney
District of Connecticut

NDIDI MOSES
Assistant United States Attorney
U.S. Attorney's Office
450 Main Street
Hartford, Connecticut 06103

OF COUNSEL:

STEVEN J. VIGGIANI
Senior Enforcement Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Square - Suite 100
Boston, MA 02109-3912

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing UNOPPOSED MOTION TO ENTER CONSENT DECREE, and MEMORANDUM IN SUPPORT, were served by via ECF, email, or first class mail, postage prepaid, this __ day of January 31, 2019, upon counsel listed below:

BRIAN C. FREEMAN
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
bfreeman@rc.com

/s/ *Brian Donohue*
BRIAN G. DONOHUE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611